Thomas E. Dvorak, ISB No. 5043
Randall A. Peterman, ISB No. 1944
Givens Pursley LLP
601 West Bannock Street
Post Office Box 2720
Boise, Idaho  83701
Telephone  (208) 388-1200
Facsimile  (208) 388-1300
tedservice@givenspursley.com
rap@givenspursley.com

Attorneys for Susan Perry and Sherman Leibow

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>BEST VIEW CONSTRUCTION & DEVELOPMENT, LLC,<br><br>                  Debtor. | Case No. 20-00674-JMM<br>Chapter 11 (Subchapter V) |

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW**

COMES NOW Sherman Leibow ("Leibow" or "Creditor") and file this Response ("Response") to the Objection to Claim and Notice – Sherman Leibow (CR 63) ("Claim Objection") filed by debtor Best View Construction & Development, LLC ("Debtor") on October 20, 2020.

Leibow filed a proof of claim no. 5 on September 22, 2020 ("POC").  The POC seeks recovery of both a secured claim and an unsecured claim in this bankruptcy proceeding.  The Debtor's Claim Objection is aimed solely at the unsecured portion of the POC; the Claim Objection "does not dispute the 'Down Payment' secured claims asserted in the Proof of Claim." Claim Objection at ¶ 1.  The unsecured portion of the POC shows damages incurred by the Creditor as a

result of the Debtor's rejection of an executory contract Purchase and Sale Agreement ("PSA"), by which the Debtor had agreed to sell one of the six condominium units which are property of the estate (Lot 4).

An objection to a proof of claim is subject to the terms of Bankruptcy Rule 3007, and Local Bankruptcy Rule 3007.1.

In its Claim Objection, the Debtor submits two and only two objections. They are dealt with separately below.

    A.    **First Objection**

The Debtor maintains that the executory contract is objectionable because the Debtor "disputes the purchase agreements contain valid legal descriptions," then relies on the case of *Ray v. Frasure*, 146 Idaho 625, 200 P.3d 1174 (2009) for the proposition that "a property address is insufficient" to provide a valid legal description for purposes of the statute of frauds . Claim Objection at ¶ 2.

As to the First Objection, first, factually, the situation here is distinguishable from *Ray v. Frasure*, as the legal description of the property is by lot and block reference to the Best View subdivision plat, which is not only attached to the contract at issue, but was later recorded with Canyon County. The law makes it clear that such reference is more than sufficient.

As factual matter, this is not simply an address passing as a legal description, but a specific lot reference to a preliminary plat that was attached to the PSA and which ultimately became a recorded final plat before the last addendum to the PSA was signed. It is notable that the principal of the Debtor, Gavin King, was the listing agent for the lot subject of the PSA, and yet tries to play both sides of the issue by alleging insufficiency of the legal description but also seeking to reject what the Debtor otherwise alleges is an executory contract. The PSA for Lot 4 and addenda thereto are attached to the POC as Exhibit B. When the PSA on Lot 4 was executed

on or about February 20, 2019, it referenced "Lot 4" in the PSA itself as well as Nampa, Canyon County, Idaho.  But in Addendum #1 dated February 21, 2019, it had the correct reference to "Lot 4 Best View Quads."  Further, Addendum #1 also had a copy of a preliminary plat map under item 1, stating "Plat Map-please place an "X" on the lot you are contracting for & use the indicated lot number on the Purchase & Sale Agreement."  There is a handwritten "x" next to "Lot-4" on the plat map.  There is only one Plat in the records of Canyon County Idaho for "Best View Quads," that Plat was recorded on September 23, 2019.  The Preliminary Plat on file with the City of Nampa that predated that final Plat was dated December 4, 2017, precisely matches the map attached to Addendum #1 of the PSA.  See Declaration of Thomas E. Dvorak in text and Exhibits A and B.

Under Idaho law, the hand written references in the addendum, including the handwritten "x" designating Lot 4 control over the inconsistent designation of "Lot 4" in the form portion of the PSA:

> Where a contract is partly written and partly printed, or **where part of it is written or printed under the special directions of the parties, and with a special view to their intention**, and the remainder is copied from a form originally prepared without special reference to the particular parties and the particular contract in question, the written parts control the printed parts, **and the parts which are purely original control those which are copied from a form, and if the two are absolutely repugnant, the latter must be so far disregarded**.

Idaho Code § 29-109 (emphasis added).  Addendum No. 1 itself also states "[t]o the extent the terms of this ADDENDUM modify or conflict with any provisions of the Purchase and Sale Agreement including all prior Addendums or Counter Offers, these terms shall control. All other terms of the Purchas and Sale Agreement including all prior Addendums or Counter Offers not modified by this ADDENDUM shall remain the same."  The subsequent addenda include Addendum No. 2 dated February 26, 2019, which provides "Lot #4 Best View Quads, Nampa Idaho."  Where a map was used for the sale of lots by lot number and readily available as part of

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 3**    15408057.1

the sale, at least one court has held that was a sufficient legal description for purposes of the statue of frauds.  In *Gowen v. Klous*, 101 Mass. 449 (1869), where the lot 13 in question was one of several lots sold according to a certain "plan," which was mentioned in the advertisement of the sale, and copies of which were furnished at the sale, and which generally located the property to be sold, and the memorandum of sale, which covered all of the lots, recited that the persons whose names were appended acknowledged themselves to be the purchasers of the lot or lots situated at the corner of Columbia and Green Streets in Dorchester, belonging to the estate of Thomas Gowen, deceased, and sold at auction on the date given, and the memorandum referred to the lot or lots of land "against which we have recorded our respective names, and at the prices recorded by the auctioneer," and also recited that the lots were delineated on a "plan by L. Briggs, and more particularly described in the advertisement hereto appended," and a copy of the advertisement was appended, and in one column on the memorandum were listed the various lots by numbers and opposite those numbers were the various signatures of the purchasers and in a third column were entered various sums of money—in the particular instance there being entered, after the signature of the defendant, the figures "9½" followed by the abbreviation "cts."—it was held that there was a sufficient description of the lot in a memorandum of sale to satisfy the statute of frauds.

Of additional significance is that the final plat was recorded on September 23, 2019, before the last and final Addendum No. 4 was executed on November 22, 2019 on Lot 4.  Thus, the contract caught up with the plat so to speak.  And a reference to a lot within a platted subdivision that is in fact contained within the relevant public records is sufficient for the statute of frauds.  *Robison v. Frasier*, 89 Idaho 326, 333, 404 P.2d 877, 881 (1965) ("The test as to the sufficiency of a description for the purpose of maintaining an action for specific performance of a real estate contract, is one that is most difficult to apply. . . .  **[P]arole or extrinsic evidence is**

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 4**         15408057.1

**admissible for the purpose of applying the description contained in the writing to show there are lands of the name and description contained in the writing**, but held that such evidence is not admissible for the purpose of supplying or adding to the description.") (emphasis added). *Accord, Neves v. Flannery,* 149 So. 618, 620 (Fla. 1933) (Noting that "reference to the block and lots of the Harmon plat 'as per plat on file in the office of the Clerk of the Circuit Court of Bay County, Florida, at Panama City,' there being only one Harmon plat so on file, was sufficient to identify the property mortgaged."); "lot 9, block 108A south, city of Miami, Fla." *Schofield v. Talley,* 84 So 193 (Fla. 1920) ("lot No. 4 block 9 N.E. in Middleboro, Ky." sufficient); *Tyler v. Onzts*, 20 SW 256 (1892)("section 1, lots No. 1 to 24 inclusive, Stein's Addition to Galesville" sufficient"); *St. Paul Land Co. v. Dayton* 43 NW 782 (Minn. 1889) ("lots four and five, in square one, south of Main Street, Columbus," sufficient).

*Ricks v. Kastera*, 433 B.R. 806 (Bankr. D. Idaho 2010) gives an example of a case similar to the present one where a description for "lots" based only on a preliminary plat was found sufficient.  In *Ricks*, the issue involved property that was sold before a final plat was recorded, just like the case here.  There, the parties entered into an agreement that described the outer boundaries of property to be subdivided and that a number of building lots would be developed and transferred. There was a description of the exterior portions of the property, but since no final plat had yet been recorded, there was no legal description of the lots, simply "all the lots in the first phase of Spur Ranch (recorded name of Bellemeade Subdivision in Eagle, Idaho, legal description attached hereto as Exhibit A)" consisting of "14 lots south of Flint Drive and 30 lots north of Flint Drive." *Id*. at 814.  The Rick's court distinguished *Frasure* by saying:

> But defects like those in the *Frasure* contract are not present in the Spur Ranch Agreement. ***Not only can the general location of the subject property be ascertained from the face of the Spur Ranch Agreement, the precise quantity of building lots and the exact***

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 5**     15408057.1

> *outer boundaries of the project are clear from the legal description attached to the contract*. Put another way, in their contract, Ricks and Kastera did not stop at inclusion of a physical address for the property, as did the parties in Frasure; rather, they provided the existing legal description of the entire property, and identified a specific amount of completed lots that were to be developed and sold by Ricks to Kastera within each portion of that parcel. . .
>
> Indeed, since the Spur Ranch property had not yet been finally platted, **they had no choice but to rely upon a legal description of the whole property supplemented by other informal identifying information**. In the Court's view, under the circumstances, neither Ricks nor Kastera could **have been more precise in describing the subject property, given the legal description of the property that was available to them at the time**.

*Id.* at 820-21(emphasis added).

Under the *Frasure* standard, further defined by *Ricks*, "**description of real property must adequately describe the property so that it is possible for someone to identify 'exactly' what property the seller is conveying to the buyer**." *Ricks* at 819-21, emphasis added. The history of the PSA and addenda thereto ascribe to the *Ricks* standard, in that the parties used "**the legal description of the property that was available to them at the time**." *Id.*, emphasis added. This description of the property was refined over time as the seller, as the developer, progressed in the development process. The parties' PSA, while not attaching a full legal description, referenced a plat that was not yet recorded, and attached a preliminary map which can be tied to the preliminary plat indicating the specific lot to be purchased. In and of itself, this is a sufficient legal description to meet the standard enunciated by this Court in *Ricks*. But in the present case, there is one more piece, making an even better case than *Ricks*. The final plat was recorded with the respective lot at issue in the same location as shown on the preliminary plat/map that was part of the contract, and the contract was amended thereafter. Thus, the contract here overlapped with the recorded final plat for Best View Quads subdivision, and thereby further validated the reference in the contract to Best View Quads subdivision. If there was ever any confusion under the contract based

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 6**    15408057.1

on the preliminary plat/map lot reference, it was clarified beyond reproach by the recording of the final plat and entry of a contract addendum thereafter. Second, the Debtor has waived and is estopped to maintain the First Objection. The doctrine of Judicial Estoppel has been characterized as follows:

> Judicial estoppel precludes a party from advantageously taking one position, then subsequently seeking a second position that is incompatible with the first. *A & J Const. Co. v. Wood*, 141 Idaho 682, 684, 116 P.3d 12, 14 (2005). The policy behind judicial estoppel is to protect "the integrity of the judicial system, by protecting the orderly administration of justice and having regard for the dignity of the judicial proceeding." Id. at 685, 116 P.3d at 15 (quoting *Robertson Supply Inc. v. Nicholls*, 131 Idaho 99, 101, 952 P.2d 914, 916 (Ct. App. 1998)). Broadly accepted, it is intended to prevent parties from playing fast and loose with the legal system. Id.; see also 31 C.J.S. Estoppel and Waiver § 186 (2012). Judicial estoppel protects the integrity of the judicial system, not the litigants; therefore, it is not necessary to demonstrate individual prejudice. *Wood*, 141 Idaho at 686, 116 P.3d at 16 (citing *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778 (9th Cir. 2001)). Judicial estoppel applies to inconsistent positions taken in bankruptcy proceedings. Id. (relying on decisions from numerous courts holding "privity ... [though] often present in judicial estoppel cases, [is] not required." *Burnes v. Pemco Aeroplex*, Inc., 291 F.3d 1282, 1286 (11th Cir. 2002)).

*McCallister v. Dixon*, 154 Idaho 891, 894, 303 P.3d 578, 581 (2013). *See also In re An-Tze Cheng,* 308 B.R. 448 (B.A.P. 9th Cir. 2004), *aff'd and remanded sub nom. In re Cheng,* 160 F. App'x 644 (9th Cir. 2005); *In re Associated Vintage Grp., Inc.*, 283 B.R. 549 (B.A.P. 9th Cir. 2002)

The vast majority of this Chapter 11 proceeding has involved the Debtor's attempts to reject the executory contract PSA, with this Creditor and others, under Section 365. The Debtor has, for the most part, succeeded in those attempts, to the great benefit of the Debtor. Not once during these proceedings has the Debtor maintained that the executory contract PSA was not enforceable or not an executory contract; instead the Debtor has consistently maintained that the

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 7**    15408057.1

PSA is an executory contract, and that the Debtor has the absolute right to reject it under Section 365.

The Debtor's proposed Plan is based upon the same premise—that the Debtor had the right to reject the existing PSA, execute a new one at a much higher price, and thus fund its Plan.

Now the Debtor has reversed course 180 degrees and maintained that—surprise—the PSA was never an executory contract. The Debtor cannot have it both ways. Having insisted on the executory contract nature of the PSA throughout the case, the Debtor should not now be allowed to reverse course. The Court should not allow such a cynical and bad faith use of the Bankruptcy Code. To do so would countenance a party "playing fast and loose with the legal system."

    **B.**    **Second Objection**

The Second Objection maintains that "the creditor's damage calculations are based on the creditors alleged expected profit from the purchase of the lot—calculated by using the final as-improved value of the property, compared to the contract purchase price." Claim Objection at ¶ 3. The Debtor cites to *Zanotti v. Cook*, 129 Idaho 151, 922 P.2d 1077 (1996) for the proposition that, "expected profits are speculative and generally disallowed." *Id.*

*Zanotti* is inapposite and inapplicable. Contrary to the Debtor's contentions, *Zanotti* stands for the following proposition:

> The general rule on damages for breach of contract is that they are not recoverable unless they are clearly ascertainable both in their nature and origin and unless it is also so established that they are the natural and proximate consequence of the breach and are not contingent or speculative. *Wing v. Hulet*, 106 Idaho 912, 918, 684 P.2d 314, 320 (Ct. App. 1984). Consequential damages need not be precisely and specifically foreseen, but they must have been reasonably foreseeable, and within the contemplation of the parties when the contract was made. Whether such damages were

reasonably foreseeable and within the contemplation of the parties is a question of fact. *Cannon Builders, Inc. v. Rice*, 126 Idaho 616, 620, 888 P.2d 790, 794 (Ct. App. 1995).

129 Idaho 154.

*Zanotti* stands for nothing more than the foreseeable requirement under *Hadley v. Baxendale* and the maximum that damages must be proven with reasonable certainty.

The Debtor's Claim Objection maintains that "the proper measure of damages is the fair market value of the property at the time the contract was deemed breached (i.e., the day prior to the bankruptcy petition) and the contract price." Objection at ¶ 3. The Debtor relies on three Ninth Circuit cases pre-dating 1993 (principally *In re Aslan*, 909 F.2d 367 (9th Cir. 1990)) for this proposition.

In *Aslan*, the Ninth Circuit began its analysis as follows:

> State law controls both the construction of the contact and the question of breach. *In re James E. O'Connell Co.*, 799 F.2d 1258, 1260 (9th Cir. 1986). Under California law, the court's construction of the contract is reviewed de novo. *Id.*

909 F.2d at 369.

> Determinations regarding the executory nature of the contact under section 365(g) and the effects of rejection pursuant to that section are conclusions of law which we review de novo. *See In re Woodson Co.*, 813 F.2d 266, 270 (9th Cir. 1987).

*Id.* at 370.

The *Aslan* court then reviewed California law to consider the issue before it. Under these facts the Ninth Circuit held that the date for determination of damages was the day before the date of the filing of the petition. The Court also stated:

> *See, e.g., In re Chi-Feng Huang*, 23 B.R. 798, 803 (Bankr. 9th Cir. 1982) (should Bankruptcy court allow sellers-debtors to reject sales contract on remand, buyer's damages would presumably include appreciation in value of property to date prior to bankruptcy petition); *In re Besade*, 76 B.R. 845, 848 (Bankr. M.D. Fla. 1987)

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 9**            15408057.1

> (buyer's damages are fair market value less contract price, taking fair market value as fixed on the day before the bankruptcy filing).

*Id.* at 371.

The Creditor disputes the Debtor's Claim Objection because *Aslan* considered a contract simply for sale of property. This contract is not just for the sale of property but also for the construction of an four unit apartment complete upon the same. The damages for breach by seller of a contract for the sale of real property typically is "the difference between the fair market value of the property at the time of the breach and the contract price, or, in other words, the buyer's loss of the benefit of the bargain." 9 Causes of Action 183 (Originally published in 1986). However, here the contract was not just to purchase the land in whatever state it was at the time of sale, but to purchase the property with a completed four unit apartment building on it. In the Restatement of Contracts, the rule as to what amounts a party subject to a breach of contract may recover to protect his expectation in the full performance of the contract is stated as follows:

> [T]he injured party has a right to damages based on his expectation interest as measured by
>
> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
>
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>
> (c) any cost or other loss that he has avoided by not having to perform.

Restatement (Second) of Contracts § 347 (1981). This provision has been cited by Idaho courts on a number of occasions. *White v. Unigard Mut. Ins. Co.*, 112 Idaho 94, 102, 730 P.2d 1014, 1022 (1986); *Sullivan v. Bullock*, 124 Idaho 738, 744, 864 P.2d 184, 190 (Ct. App. 1993); and *Gilbert v. Tony Russell Const.*, 115 Idaho 1035, 1039, 772 P.2d 242, 246 (Ct. App. 1989). "Contract damages are ordinarily based on the injured party's expectation interest and are

intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed. " Restatement (Second) of Contracts § 347 Cmt. a. (1981). "The first element that must be estimated in attempting to fix a sum that will fairly represent the expectation interest is the loss in the value to the injured party of the other party's performance that is caused by the failure of, or deficiency in, that performance. **If no performance is rendered, the loss in value caused by the breach is equal to the value that the performance would have had to the injured party.**" Restatement (Second) of Contracts § 347 Cmt. b. (1981) (emphasis added). Creditor will present evidence in the form of an appraisal that if the 4 Unit Apartment had been built on the property at the time of breach as the contract required it to have been built, the value of each lot would have been $750,000.00. There is no reason why damages should be limited at that point to the difference between the contracted price and the actual unfinished value. To do so would be to allow the Debtor to appropriate that expectation damage component of the benefit of the bargain and leave Creditor with no recovery for that portion of its valid expectation of full performance of the promise to build a four unit apartment on the properties.

Assuming for the sake of argument that the Debtor's legal premise is valid that the difference is limited to the fair market value of the property as constructed at the time of breach, the Creditor will also submit appraisal evidence at the hearing, that the value of the units on the date prior to the date of the filing of the bankruptcy was at least $557,000.00, and not the $300,000.00 value submitted by the Debtor. *See* CR 1, Schedule A/B, Part 9. The Creditor maintains that the Debtor has submitted an abnormally low valuation to benefit its plan projections, and that the actual valuation of the lot is much higher.

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 11**     15408057.1

More importantly, the Claim Objection does not take into account the very recent U.S. Supreme Court case of the most recent U.S. Supreme Court regarding Section 365, *Mission Products Holdings, Inc. v. Tempnology, LLC*, 139 S.Ct. 1652 (2019).  While that case dealt with a license for intellectual property, its critical premise is equally applicable here:

> Consider a made-up executory contract to see how the law of breach works outside bankruptcy. A dealer leases a photocopier to a law firm, while agreeing to service it every month; in exchange, the firm commits to pay a monthly fee. During the lease term, the dealer decides to stop servicing the machine, thus breaching the agreement in a material way. The law firm now has a choice (assuming no special contract term or state law). The firm can keep up its side of the bargain, continuing to pay for use of the copier, while suing the dealer for damages from the service breach. Or the firm can call the whole deal off, halting its own payments and returning the copier, while suing for any damages incurred. See 13 R. Lord, Williston on Contracts § 39:32, pp. 701-702 (4th ed. 2013) ("[W]hen a contract is breached in the course of performance, the injured party may elect to continue the contract or refuse to perform further"). But to repeat: The choice to terminate the agreement and send back the copier is for the law firm. By contrast, the dealer has no ability, based on its own breach, to terminate the agreement. Or otherwise said, the dealer cannot get back the copier just by refusing to show up for a service appointment. The contract gave the law firm continuing rights in the copier, which the dealer cannot unilaterally revoke.
>
> And now to return to bankruptcy: If the rejection of the photocopier contract "constitutes a breach," as the Code says, then the same results should follow (save for one twist as to timing). Assume here that the dealer files a Chapter 11 petition and decides to reject its agreement with the law firm. That means, as above, that the dealer will stop servicing the copier. It means, too, that the law firm has an option about how to respond—continue the contract or walk away, while suing for whatever damages go with its choice. (Here is where the twist comes in: Because the rejection is deemed to occur "immediately before" bankruptcy, the firm's damages suit is treated as a pre-petition claim on the estate, which will likely receive only cents on the dollar. See supra, at 1658-1659.) And most important, it means that assuming the law firm wants to keep using the copier, the dealer cannot take it back. A rejection does not terminate the contract. When it occurs, the debtor and counterparty do not go back to their pre-contract positions. Instead, the counterparty retains the rights it has received under the agreement. As after a breach, so too after a rejection, those rights survive.

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 12**   15408057.1

All of this, it will hardly surprise you to learn, is not just about photocopier leases. Sections 365(a) and (g) speak broadly, to "any executory contract[s]." Many licensing agreements involving trademarks or other property are of that kind (including, all agree, the Tempnology-Mission contract). The licensor not only grants a license, but provides associated goods or services during its term; the licensee pays continuing royalties or fees. If the licensor breaches the agreement outside bankruptcy (again, barring any special contract term or state law), everything said above goes. In particular, the breach does not revoke the license or stop the licensee from doing what it allows. *See, e.g., Sunbeam*, 686 F. 3d at 376 ("Outside of bankruptcy, a licensor's breach does not terminate a licensee's right to use [the licensed] intellectual property"). And because rejection "constitutes a breach," § 365(g), the same consequences follow in bankruptcy. The debtor can stop performing its remaining obligations under the agreement. But the debtor cannot rescind the license already conveyed. So the licensee can continue to do whatever the license authorizes.

In preserving those rights, Section 365 reflects a general bankruptcy rule: The estate cannot possess anything more than the debtor itself did outside bankruptcy. *See Board of Trade of Chicago v. Johnson*, 264 U. S. 1, 15, 44 S.Ct. 232, 68 L.Ed. 533 (1924) (establishing that principle); § 541(a)(1) (defining the estate to include the "interests of the debtor in property" (emphasis added)). As one bankruptcy scholar has put the point: Whatever "limitation[s] on the debtor's property [apply] outside of bankruptcy[] appl[y] inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either." D. Baird, Elements of Bankruptcy 97 (6th ed. 2014). So if the not-yet debtor was subject to a counterparty's contractual right (say, to retain a copier or use a trademark), so too is the trustee or debtor once the bankruptcy petition has been filed. The rejection-as-breach rule (but not the rejection-as-rescission rule) ensures that result. By insisting that the same counterparty rights survive rejection as survive breach, the rule prevents a debtor in bankruptcy from recapturing interests it had given up. . . .

And even putting aside that incongruity, Tempnology's plea to facilitate trademark licensors' reorganizations cannot overcome what Sections 365(a) and (g) direct. The Code of course aims to make reorganizations possible. But it does not permit anything and everything that might advance that goal. *See, e.g., Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U. S. 33, 51, 128 S. Ct. 2326, 171 L. Ed. 2d 203 (2008) (observing that in enacting Chapter 11, Congress did not have "a single purpose," but "str[uck] a balance" among multiple competing interests (internal quotation

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 13**

> marks omitted)). Here, Section 365 provides a debtor like Tempnology with a powerful tool: Through rejection, the debtor can escape all of its future contract obligations, without having to pay much of anything in return. See supra, at 1658-1659. But in allowing rejection of those contractual duties, Section 365 does not grant the debtor an exemption from all the burdens that generally applicable law—whether involving contracts or trademarks—imposes on property owners. See 28 U.S.C. § 959(b) (requiring a trustee to manage the estate in accordance with applicable law). Nor does Section 365 relieve the debtor of the need, against the backdrop of that law, to make economic decisions about preserving the estate's value—such as whether to invest the resources needed to maintain a trademark. In thus delineating the burdens that a debtor may and may not escape, Congress also weighed (among other things) the legitimate interests and expectations of the debtor's counterparties. The resulting balance may indeed impede some reorganizations, of trademark licensors and others. But that is only to say that Section 365's edict that rejection is breach expresses a more complex set of aims than Tempnology acknowledges.

139 S.Ct. at 1662-66.

This important Supreme Court case changes the complexion of the Debtor's Claim Objection, and calls into question the very basis for the Debtor's Claim Objection.

The Creditor reserves all other rights as to the Second Objection.

The Debtor's Claim Objection should be denied, and the Creditor's POC should be allowed in its entirety.

DATED this 19th day of November, 2020.

>> GIVENS PURSLEY LLP
>
> By  /s/ Randall A. Peterman
>     Thomas E. Dvorak – Of the Firm
>     Randall A. Peterman – Of the Firm
>     Attorneys for Susan Perry and
>     Sherman Leibow

`

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 14**   15408057.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19th day of November, 2020, I filed the foregoing **RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW** electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

**Matthew T. Christensen**
mtc@angstman.com
mtcecf@gmail.com
megan@angstman.com
mlanderson@angstman.com
abbie@angstman.com
ecf@angstman.com
atty_christensen@bluestylus.com
christensenmr81164@notify.bestcase.com

**United States Trustee**
ustp.region18.bs.ecf@usdoj.gov

**Brett R. Cahoon**
ustp.region18.bs.ecf@usdoj.gov

**Matthew W. Grimshaw**
matt@grimshawlawgroup.com

**Kirk J. Houston**
khouston@whitepeterson.com
sarah@smithmalek.com
jperdue@whitepeterson.com

**Jed W. Manwaring**
jmanwaring@evanskeane.com
valerie@evanskeane.com

**Mark B. Perry**
mbp@perrylawpc.com
info@perrylawpc.com
tlh@perrylawpc.com
plr@perrylawpc.com
jks@perrylawpc.com
tay@perrylawpc.com

**Chad Moody**
chad@angstman.com
megan@angstman.com
caroline@angstman.com
abbie@angstman.com
ecf@angstman.com

**Heidi Buck Morrison**
heidi@racineolson.com
mandy@racineoflson.com
cheryl@racineolson.com

**Jared M. Harris**
jharris@bakerharrislaw.com
cblackburn@bakerharrislaw.com

**Jonathan W. Harris**
jwharris@bakerharrislaw.com
cblackburn@bakerharrislaw.com

**Jay J. Kiiha**
jkiiha@whitepeterson.com

**RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW - 15**           15408057.1

| | |
|---|---|
| **D. Blair Clark** <br> dbc@dbclarklaw.com <br> mbc@dbclarklaw.com <br> maryann@dbclarklaw.com <br> jackie@dbclarklaw.com <br> ecf.dbclaw@gmail.com | **Timothy D. Ducar** <br> orders@azlawyers.com |
| **Daniel C. Green** <br> dan@racinelaw.net <br> mcl@racinelaw.net | **Trevor L. Hart** <br> tlh@perrylawpc.com <br> jks@perrylawpc.com <br> mbp@perrylawpc.com <br> taw@perrylawpc.com |

AND, I FURTHER CERTIFY that on such date I served the foregoing **RESPONSE TO OBJECTION TO CLAIM AND NOTICE – SHERMAN LEIBOW** on the following non-CM/ECF Registered Participants in the manner indicated:

| | |
|---|---|
| Best View Construction & Development, LLC <br> 1625 Mustang Mesa Avenue <br> Middleton, ID 83644 | (X) U.S. Mail, Postage Prepaid <br> ( ) Hand Delivered <br> ( ) Overnight Mail <br> ( ) Facsimile |

                                                 */s/ Randall A. Peterman*
                                                 Randall A. Peterman