# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

In re:

**BEST VIEW CONSTRUCTION & DEVELOPMENT, LLC,**

**Bankruptcy Case**

**No. 20-00674-JMM**

**Debtor**.

## MEMORANDUM OF DECISION

Appearances:

Matthew Todd Christensen, ANGSTMAN JOHNSON, PLLC, Boise, Idaho, attorney for Debtor.

Matthew W. Grimshaw, Boise, Idaho, Subchapter V Trustee.

Thomas E. Dvorak, GIVENS PURSLEY, LLP, Boise, Idaho, attorney for creditors Sherman Leibow and Susan Perry.

Heidi Buck Morrison, RACINE OLSON, PLLP, Pocatello, Idaho, attorney for creditor Josiah Silva Trust.

Trevor L. Hart, PERRY LAW, P.C., Boise, Idaho, attorney for BRMK Lending, LLC.

Jason R. Naess, Boise, Idaho, Assistant United States Trustee.

### *Introduction*

For consideration in this decision are objections filed by debtor Best View

Construction & Development, LLC ("Debtor") to proofs of claim filed by creditors Susan

MEMORANDUM OF DECISION − 1

Perry ("Perry"), Sherman Leibow ("Leibow"), and the Josiah M. Silva Living Trust ("Silva") (collectively "Creditors") in this chapter 11, subchapter V[1] case.

Following briefing on the issues, the Court conducted an evidentiary hearing on the objections and took the matters under advisement. After consideration of the briefing, testimony, exhibits, and oral argument presented, as well as the applicable law, the Court issues the following decision which resolves the objections. Fed. R. Bankr. P. 7052; 9014.

### General Facts

In 2019, Debtor was developing a tract of land in the City of Nampa, Canyon County, Idaho. Gaven[2] J. King ("King") was the owner of the Debtor, and is also a licensed realtor and broker. Debtor began the development process with the city, and after its initial name for the development was rejected, apparently because there was another development with the same or similar name, Debtor settled on "Best View Quads" as the name of the project. It had a preliminary or conceptual plat created which provided for six separate lots on the parcel. Ex. 307. On each lot, a quadplex was to be constructed. *Id.* Debtor then lined up buyers for each of the lots and entered into a Pre-Sold New Construction Real Estate Purchase and Sale Agreement ("PSA") with each

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[2] Mr. King's first name is spelled either "Gaven" or "Gavin" in the documents filed on the Court's docket as well as those admitted into evidence in the proceeding at issue here. Because the signature pages filed with the Court indicate his name is "Gaven J. King," the Court will utilize that spelling.

MEMORANDUM OF DECISION − 2

buyer.  At issue here are the PSAs executed by Perry, Leibow, and Silva.  Exs. 219; 300–301.

Each of the PSAs were supplemented with a number of addenda.  All addendums were on a form provided or prepared by King, and the specific information inserted into the forms, except the signatures and the "X" designating the particular lot to be purchased, were filled in by someone other than King, Perry, Leibow, or Silva; likely the Debtor's realtor.  Moreover, all addenda except Addendum #1 to each of the PSAs, contain the following provision:

> To the extent the terms of this ADDENDUM modify or conflict with any provisions of the Purchase and Sale Agreement including all prior Addendums or Counter Offers, these terms shall control.  **All other terms of the Purchase and Sale Agreement including all prior Addendums or Counter Offers not modified by this ADDENDUM shall remain the same.**  Upon its execution by both parties, this agreement is made an integral part of the aforementioned Agreement.

(emphasis in originals).

A final plat was recorded on September 23, 2019 in Book 48, page 47,[3] Ex. 308, and construction on the quadplexes began in the Fall of 2019.  King testified the lot boundaries changed somewhat between the preliminary and final plats, but the buildings remained the same.  *See also* Exs. 307–08.  Ultimately, the project foundered, and before the quadplexes were completed, on July 22, 2020, Debtor filed a bankruptcy petition under chapter 11, subchapter V.  Dkt. No. 1.  That same day, it moved to reject a number

---

[3] The record is not clear what the "Book" refers to, but the Court assumes it is either the Nampa City or Canyon County Book of Plats.

MEMORANDUM OF DECISION − 3

of contracts, including Perry's PSAs for Lots 2 and 3, Leibow's PSA for Lot 4, and

Silva's PSA for Lot 6.  Dkt. No. 5.  Those contracts were ultimately rejected.  Dkt. Nos.

40 (order granting motion as to Perry contracts and Leibow contract); 138 (oral ruling

granting motion as to Silva contract).  According to King's testimony, on the date the

bankruptcy petition was filed, Lot 2 was 50% completed; Lot 3 was 55% completed; Lot

4 was 60% completed; and Lot 6 was 65–70% completed.[4]

Perry filed a proof of claim on September 22, 2020 in the amount of $633,432.84,

with $150,000 of that amount listed as secured and the remaining balance unsecured.

Claims Reg. No. 4-1.  Leibow filed a proof of claim that same day in the amount of

$349,910.34, of which $125,000 is listed as secured.  Claims Reg. No. 5.  Finally, Silva

filed a proof of claim on September 29, 2020, but the claim was amended twice.  The

most recent amendment was filed on November 19, 2020 and lists a claim in the amount

of $619,100 with $400,000 secured.  Claims Reg. 8-3.

Debtor objected to each of these proofs of claim on October 20, 2020, alleging in

each objection that the legal description of the subject property contained in the PSA was

insufficient under the statute of frauds and that the method used to compute the unsecured

portion of each claim was incorrect.  Dkt. Nos. 62–64.  Debtor subsequently completed

the construction and sold all six lots in the development, including the lots at issue here,

to an individual purchaser.  Exs. 102–07.

---

[4] Lots 1 and 5 are not at issue.

MEMORANDUM OF DECISION – 4

### *Facts Specific to Individual Proofs of Claim*

A.  Lot 3, Susan Perry

*1.  Contract Provisions*

On September 20, 2018, Perry executed a PSA to buy Lot 3.  Ex. 300 at Ex. C, p. 26 of 48.  The document was signed six days later by King.  *Id.*  The total purchase price was $499,000, and Perry was to pay $20,000 earnest money down.  *Id.*  Closing was to occur on May 31, 2019.  *Id.* at 33 of 48.  The PSA refers to Lot 3, and lists the address of the property as "TBD E. Maine Ave." in the City of Nampa, Canyon County, Idaho and lists the subdivision as "0 Not Applic."  It refers to the plat of record or an alternative legal description as "TBD."  The contract also refers to Addendum #1.  *Id.* at p. 27 of 48 line 103; p. 34 of 48 lines 445, 478.

The same day Perry signed the PSA, she also executed an addendum to the contract.  *Id.* at pp. 35–40 of 48.  Addendum #1 provides the property address as "Lot 3 TBD Nampa Idaho" but goes a step further and includes a photocopy of the preliminary plat.  *Id*. at p. 35 of 48.  It further directed Perry to mark the lot she intended to purchase, and she marked a handwritten "X" on the border between Lots 2 and 3; however, Lots 1 and 2 were marked "Pending" in red lettering.  *Id.*  King testified that he added the term "pending" to indicate the lot was under contract and unavailable.  Addendum #2, executed nine days later, provides the address as "TBD Lot 3 Best View Quads, Nampa, Idaho."  *Id.* at p. 40 of 48.  This second addendum also increased the total earnest money to $25,000, and extended the completion deadline to July 31, 2019.  *Id.* at p. 35 of 48.

MEMORANDUM OF DECISION − 5

The Court's record does not contain Addendum #3. Addendum #4, dated July 24, 2019, provides the address is "TBD Unit 3 E. Maine Ave., Nampa, Idaho," and extends the completion date to November 31 [sic], 2019. *Id.* at p. 41 of 48.

Between the execution of Addendums 4 and 5, the final plat was recorded. Ex. 308. Addendum #5 moved the closing date to on or before April 30, 2020. Ex. 300 at Ex. C, p. 42 of 48. It further provided the address was "TBD Unit 3 E. Maine Ave., Nampa, Idaho" but the agreement section of that addendum indicates that the "final property address is 1908 Sunnyridge Road, Nampa, Idaho 83686." *Id.*

B.  Lot 2, Susan Perry

*1. Contract Provisions*

Perry contracted to purchase a second lot, this time Lot 2.[5] Ex. 300 at Ex. B, p. 7 of 48. The PSA for Lot 2 was signed on January 9, 2019 by Perry and by King on February 13, 2019. *Id.* The total purchase price was $549,900, and according to the PSA, Perry was to pay $25,000 earnest money down. *Id.* The PSA includes the lot number, the City, County, and State, as well as the name of the subdivision — Best View Quads. *Id.* It provides for a closing date of May 31, 2019. *Id.* at p. 8 of 48.

---

[5] This PSA indicates Perry's intention to purchase Lot 4, but each of the addenda, beginning with the first, indicate the PSA relates to Lot 2. The testimony at the hearing concurred.

MEMORANDUM OF DECISION − 6

This PSA also referred to Addendum #1.  *Id.* at p. 8 of 48 line 103; p. 15 of 48 lines 445, 478.  That addendum, executed the same day as the purchase agreement,[6] states the lot number and references "Best View Quads," but also includes a photocopy of the preliminary plat, upon which Perry marked Lot 2 with a handwritten "X" indicating her intention to purchase that lot.  *Id.* at p. 16 of 48.  Addendum #2, also executed that same day, refers to the property as "TBD Lot 2 Best View Quads, Nampa, Idaho, 83686," and extends the closing date to August 31, 2019.  *Id.* at pp. 20–21 of 48.  Addendum #3, executed on February 13, 2019 by Perry and one week later by King, referred to the address as "TBD Unit B E. Maine Ave., Nampa, Idaho" and agreed the address was to be "Lot 2 Best View Quads, Nampa ID until lot and block are given."  *Id.* at p. 23 of 48.  This addendum also increased the total earnest money to $125,000.  *Id.*

Addendum #4 was executed on July 24, 2019, extended the construction completion deadline to November 31 [sic], 2019, and provided the address as "TBD Unit 2 E. Maine Ave., Nampa, Idaho."  *Id.* at p. 23 of 48.  Between the execution of Addendums 4 and 5, the final plat was recorded.  Addendum #5 provided the address of the property was "TBD Unit 2 E. Maine Ave., Nampa, Idaho," but in the agreement section indicated the "final property address is 1906 Sunnyridge Road, Nampa, Idaho 83686."  *Id*. at p. 24 of 48.  It further extended the closing date to April 30, 2020.  *Id.*

---

[6] Addendum #1 is dated January 9, 2018, but the testimony at the hearing clarified that the year was actually 2019.

MEMORANDUM OF DECISION − 7

### 2. *Proof of Claim*

Perry filed a joint proof of claim covering the purchase of lots 2 and 3, totaling $633,432.84. Claims Reg. at 4-1. It lists Lots 2 and 3 as having a combined value of $1,500,000 ($750,000 each), and indicates that $150,000 of the claim is secured, representing the $25,000 and $125,000 down payments. *Id.* This leaves $483,432.84 unsecured. *Id.* It also lists a fixed interest rate of 12%. *Id.* Perry further breaks down her proof of claim as follows, including attorneys' fees:

**LOT 2**

| Description | Amount |
|---|---|
| **SECURED** | |
| Down Payment on Lot 2 via Purchase and Sale Agreement | $125,000.00 |
| **UNSECURED** | |
| Lost Profit (computed based upon the anticipated value of the lot), $750,000.00 (creditor is aware that the Debtor has a new Purchase and Sale Agreement at $685,000.00) less the purchase price in Perry's original Purchase and Sale Agreement $549,900.00 | $200,100.00 |
| Interest at the statutory rate established by Idaho Code Section 28-22-104 (from February 22, 2019 to July 22, 2020). Interest continues to accrue at $41.10 per diem. | $ 21,248.70 |
| Attorneys' Fees and Costs (as of July 22, 2020) | $ 5,650.72 |
| **TOTAL AMOUNT DUE AS OF JULY 22, 2020\*** | **$351,999.42** |

*\*Interest (at the statutory rate established by Idaho Code Section 28-22-104), costs, and attorneys' fees have accrued and continue to accrue until creditor is paid in full.*

Ex. 219.

/////

MEMORANDUM OF DECISION − 8

**LOT 3**

| Description | Amount |
|---|---|
| **SECURED** | |
| Down Payment on Lot 3 via Purchase and Sale Agreement | $ 25,000.00 |
| **UNSECURED** | |
| Lost Profit (computed based upon the anticipated value of the lot), $750,000.00 (creditor is aware that the Debtor has a new Purchase and Sale Agreement at $685,000.00) less the purchase price in Perry's original Purchase and Sale Agreement $499,000.00 | $251,000.00 |
| Interest at the statutory rate established by Idaho Code Section 28-22-104 (from October 1, 2018 to July 22, 2020).  Interest continues to accrue at $8.22 per diem. | $  5,433.42 |
| Attorneys' Fees and Costs (as of July 22, 2020) | Identified above for Lot 2 |
| **TOTAL AMOUNT DUE AS OF JULY 22, 2020\*** | **$281,433.42** |

*Id.*

## C.  Lot 4, Sherman Leibow

### 1.  *Contract Provisions*

Leibow's contractual history is much the same.  On February 22, 2019, he executed a PSA agreeing to pay a total of $549,000 for Lot 4, with $125,000 as earnest money.  Ex. 301 at p. 6 of 25.  King signed the contract on February 26, 2019.  *Id.*  The PSA listed the address of the property as "Lot 4 E. Maine Ave." in the city of Nampa, Canyon County, Idaho, the subdivision as "0 Not Applic.," and referred to the plat of record or an alternative legal description as "CLA."  *Id.*  Closing was to occur on June 15, 2019.  *Id.*  at p. 13 of 25.

The contract also referred to Addendum #1.  *Id.* at p. 7 of 25 at line 103; p. 14 of 25 at lines 445, 478.  That addendum, dated February 21, 2019, provided the address as "Lot 4 Best View Quads," and similarly included the preliminary plat, upon which

MEMORANDUM OF DECISION − 9

Leibow marked Lot 4 with a handwritten "X" indicating his intention to purchase that lot. *Id.* at p. 15 of 25. Addendum #2, executed February 26, 2019, referred to the property as "Lot #4, Best View Quads, Nampa, Idaho." *Id.* at p. 20 of 25. Addendum #3 extended the closing date to November 30, 2019, and provided the address as "Lot 4 E. Maine Ave., Nampa, Idaho." *Id.* at p. 21 of 25. Addendum #4, executed after the final plat was recorded, provided the address is "TBD Lot 4 E. Maine Ave., Nampa, Idaho" and in the agreement section below indicated the "final property address is 1910 Sunnyridge Road, Nampa, Idaho 83686." *Id.* at p. 22 of 25. This addendum moved the closing date to on or before April 30, 2020. *Id.*

  *2. Proof of Claim*

Leibow's claim is for a total of $349,910.34. Claims Reg. at 5-1. It valued Lot 4 at $750,000, with the $125,000 down payment as a secured claim and $224,910.34 as the unsecured portion. *Id.* It also included a fixed interest rate of 12%. *Id.* Additionally, Leibow's claim has the following components:

/////

MEMORANDUM OF DECISION − 10

**LOT 4**

| Description | Amount |
|---|---|
| **SECURED** | |
| Down Payment on Lot 4 via Purchase and Sale Agreement | $125,000.00 |
| **UNSECURED** | |
| Lost Profit (computed based upon the anticipated value of the lot), $750,000.00 (creditor is aware that the Debtor has a new Purchase and Sale Agreement at $685,000.00) less the purchase price in Perry's original Purchase and Sale Agreement $549,900.00 | $200,100.00 |
| Interest at the statutory rate established by Idaho Code Section 28-22-104 (from February 27, 2019 to July 22, 2020). Interest continues to accrue at $41.10 per diem. | $ 21,043.20 |
| Attorneys' Fees and Costs (as of July 22, 2020) | $  3,767.14 |
| **TOTAL AMOUNT DUE AS OF JULY 22, 2020\*** | **$349,910.34** |

*\*Interest (at the statutory rate established by Idaho Code Section 28-22-104), costs, and attorneys' fees have accrued and continue to accrue until creditor is paid in full.*

Ex. 301 at pp. 1 of 25–4 of 25.

C.  Lot 6, Josiah M. Silva Living Trust

1.  *Contract Provisions*

Finally, the purchase and sale agreement for Lot 6 was executed by Josiah Silva

on behalf of the trust on March 8, 2019 and by King the following day.  Ex. 219 at Bates

No. 476.  The total purchase price was $550,000 with $125,000 earnest money required.

*Id.* at Bates Nos. 476, 504.  Silva also paid a $275,000 construction deposit to Pioneer

Title.  Ex. 219 at Bates No. 503.  Approximately $25,000 of that sum remained at the title

company and is available for Silva to obtain.  The PSA described the property as "Unt

[sic] F Best View Quads in the City of Nampa, Canyon County, Idaho," listed the

subdivision as "Best View Quads," and referred to the plat of record or an alternative

MEMORANDUM OF DECISION − 11

legal description as "Lot 6 Best View Quads (temporary until parcel numbers are assigned)."[7]  *Id.* at Bates No. 476.  Closing was to take place no later than July 31, 2019. *Id.* at Bates No. 483.

Addendum #1, dated March 8, 2019, provides the address as "TBD Lot 6, Unit F, E Maine Ave., Nampa, ID 83686," and also includes a photocopy of the preliminary plat, upon which Silva marked Lot 6 with a handwritten "X" indicating his intention to purchase that lot.  *Id.* at Bates No. 485.  The second Addendum, also executed on March 8, 2019, indicated the address is "Lot 6 Best View Quads" and includes, *inter alia,* a number of specifics about the construction schedule and associated costs.  *Id.* at Bates No. 491.  Addendum #3 provides the address as "TBD Unit F E. Maine Ave., Nampa, Idaho 83686," and corrected an error regarding the amount due at closing.  *Id.* at Bates No. 493.  Addendum #4, dated July 22, 2019, utilized the same address as the previous addendum, and extended the closing date to December 1, 2019.  *Id.* at Bates No. 495.

On September 23, 2019, the final plat was recorded.  About a month later, on October 16, 2019, King and Silva executed and recorded a Memorandum of Contract for Sale and Purchase of Real Property, which directly refers to the recorded final plat.  Ex. 219 at Bates Nos. 508–09.

---

[7] Where the other contracts referred to Addendum #1, this agreement refers to "Exhibit A."  Ex. 219 at line 103.  The Court does not know of any "Exhibit A" to this contract.  The PSA does refer to Addendum #1 near the signatures on Bates No. 484 at lines 445, 478.

MEMORANDUM OF DECISION − 12

About five weeks later, on November 23, 2019, King signed Addendum #5 which did not include the information for the recorded plat, but provided the address as "TBD Unit E [sic] E. Maine Ave." in Nampa, Idaho and in the agreement section below indicated the "final property address is 1914 Sunnyridge Road, Nampa, Idaho 83686." Ex. 219 at Bates No. 497. It also extended the closing date to April 30, 2020. *Id.* Silva did not sign this addendum until December 2, 2019.

In the case of this transaction, two additional addenda were executed. Addendum # 6 is also dated December 2, 2019, and refers to the address as "TBD Unit F E. Maine Ave., Nampa, ID 83686." *Id.* at Bates No. 499. It also includes the 1914 Sunnyridge Road address in the agreement portion as well as the April 30, 2020 extended closing date. *Id.* It further includes a penalty clause in favor of Silva for delays beyond April 30, 2020. *Id.* Finally, the seventh and final addendum was executed on December 16, 2019, and includes the address as "1914 Sunnyridge Road, Nampa, ID 83686." *Id.* at Bates No. 501. Its purpose was to name the listing brokerage. *Id.*

### 2. Proof of Claim

Silva's amended claim for the purchase of Lot 6 totals $619,100. Claims Reg. at 8-3. It values Lot 6 at $750,000, with $400,000 of the claim secured, representing sums paid to Debtor, and $219,100 unsecured. *Id.* It also includes a fixed interest rate of 12%. *Id.* Silva's claim further includes additional sums pursuant to the penalty clause, as well as attorneys' fees, as follows:

MEMORANDUM OF DECISION − 13

**LOT 6**

| Description: | Amount: |
|---|---|
| **SECURED PORTION OF CLAIM** | |
| Amounts paid to date pursuant to Purchase and Sale Agreement of Lot 6 | $400,000.00 |
| **UNSECURED PORTION OF CLAIM** | |
| Market Value of property ($750,000.00) less the purchase price ($550,000) under the PSA between Debtor and Josiah M. Silva Trust | $200,000.00 |
| Daily penalty owed by Seller/Debtor beginning May 1, 2020, pursuant to RE-11 Addendum dated December 2, 2019. | $15,100.00 |
| Attorney's Fees | $4,000.00 |
| **TOTAL:** | **$619,100.00** |

Ex. 219 at Bates No. 506.  Of the secured portion, the parties agree that approximately

$25,000 of Silva's down payment remains at the title company, to which Debtor has

never objected to Silva reclaiming.

### *Analysis and Disposition*

Debtor's objections to Creditors' proofs of claim are twofold.  The first argument

advanced by Debtor is that the PSAs at issue violate the statute of frauds and are

therefore unenforceable.  Second, Debtor contends that the Creditors calculated the

damages incorrectly, rendering the unsecured portion of the proofs of claim

objectionable.  The Court will consider each of these issues.

1.  Objections to Proofs of Claim Generally

Under Rule 3001(f), a timely filed proof of claim "constitutes prima

facie evidence of the validity and amount of the claim" which is deemed allowed unless a

party in interest objects.  § 502(a); Rule 3001(f); *see also In re Davis*, 554 B.R. 918, 921

MEMORANDUM OF DECISION − 14

(Bankr. D. Idaho 2016); *In re Gray*, 522 B.R. 619, 625 (Bankr. D. Idaho 2014). If a party

objects to a proof of claim, however, the Court will conduct a hearing to determine the

amount of the claim, and to allow the claim. § 502(b)(1). The party objecting to the

allowance of a claim bears the burden "to produce evidence sufficient to negate the prima

facie validity of the filed claim. If the objector produces such evidence, the

ultimate burden of persuasion remains on the claimant to demonstrate by a preponderance

of the evidence that the claim deserves to share in the distribution of the debtor's

assets." *In re Gray*, 522 B.R. at 625; *Spencer v. Pugh (In re Pugh),* 157 B.R. 898, 901

(9th Cir. BAP 1993).

2. Judicial Estoppel

At the outset, the Court will consider Creditors' contention that principles of

judicial estoppel preclude Debtor from taking inconsistent positions regarding the PSAs.

On one hand, in this bankruptcy case Debtor has acknowledged the contracts enough to

respect—and formally reject—them as executory. Moreover, in its confirmed plan,[8]

---

[8] In Debtor's confirmed plan, Class No. 11 provides for allowed general unsecured claims, including the unsecured portion of Creditors' claims, and recognizes the claims litigation that is the subject of this memorandum decision. It states:

> This class shall consist of the allowed unsecured claims not entitled to priority and not expressly included in the definition of any other class. This class includes, without limitation, allowed claims arising out of the rejection of any executory contract, each allowed claim secured by a lien on property in which the Debtor has an interest to the extent such claim is determined to be unsecured pursuant to 11 U.S.C. §506(a) (such as the unsecured portion of Class 6), or unsecured by way of avoidance pursuant to 11 U.S.C. §522(f), and each such claim of the class described in 11 U.S.C. § 507(a), to the extent that the allowed amount of such claim exceeds the amount which such claim may be afforded priority thereunder. Once the previously-described secured classes are paid in

MEMORANDUM OF DECISION − 15

Debtor has agreed to pay Creditors their secured claims stemming from the PSAs. On the other hand, Debtor seeks to reduce the unsecured claims of these Creditors by arguing the PSAs violate the statute of frauds. Creditors contend Debtor should be judicially estopped from taking these inconsistent positions in the same case.

"[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion." *Ah Quin v. Cty. of Kauai Dep't of Transp.*, 733 F.3d 267, 270–71 (9th Cir. 2013) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 750, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (internal quotation marks omitted)). The purpose of judicial estoppel "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id*. at 270 (quoting *New Hampshire v. Maine*, 532 U.S. at 749–50 (citation and internal quotation marks omitted)).

The courts consider a number of factors in determining whether judicial estoppel applies in a particular case. "First, a party's later position must be 'clearly inconsistent' with its earlier position." *Id*. "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception

---

full through the ongoing closings of the sale of the quadplexes, the net proceeds not paid on account of secured claims shall be paid to creditors in this class, on a pro rata basis, until the parcels are all sold and all net proceeds distributed. *Depending on the outcome of various claim objection proceedings,* the Debtor projects payment of between 45 and 100% of the allowed claims in this class."

Dkt. No. 204 at pp. 9–10 of 106 (emphasis added).

MEMORANDUM OF DECISION − 16

that either the first or the second court was misled." *Id*. "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id*.; *see also United States v. Hart (In re Hart)*, 563 B.R. 15, 35 (Bankr. D. Idaho 2016).

The Court concludes the elements of judicial estoppel are not present here, largely because Debtor has not changed its position regarding the contracts at issue. Rather, in this case, Debtor has taken incongruous positions from the start. It has always sought to both reject the PSAs and deem them unenforceable under the statute of frauds, but at the same time recognize the down payments made pursuant to those contracts, and pay those secured claims through the plan. Neither the Creditors nor the Court have been misled about Debtor's intentions. Finally, Debtor's position will not give it an unfair advantage or impose an unfair detriment on the Creditors. Had Debtor rejected the contracts, argued its statute of frauds defense, but refused to pay the secured claims, Creditors would have had to exert approximately the same effort as under the circumstances presented here. Accordingly, the Court in its discretion declines to invoke the doctrine of judicial estoppel.

## 3. Legal Description

The Debtor asserts a violation of the statute of frauds as a basis for its objection to the Silva, Leibow, and Perry proofs of claim. It argues the legal descriptions in the PSAs are insufficient under the statute of frauds, and therefore the agreements themselves are unenforceable. This is because none of the PSAs, or any of the various addenda to those

MEMORANDUM OF DECISION − 17

agreements, reference any recorded plat, or book and page number in a book of plats.  In response, the Creditors contend that not only are the legal descriptions included in the PSAs and the addenda legally sufficient under the statute of frauds, but that the parties used the best legal description available to them at the time they executed the contracts at issue, rendering them sufficient.

### A.  Statute of Frauds, Generally

The statute of frauds requires certain agreements to be in writing.  Pursuant to Idaho Code § 9-505(4), a contract for the sale of real property is such an agreement.  "At a minimum, land sale contracts must typically specify the parties involved, the subject matter thereof, the price or consideration, a description of the property and all other essential terms of the agreement."  *Bauchman-Kingston P'ship, LP v. Haroldsen*, 149 Idaho 87, 91, 233 P.3d 18, 22 (2008) (citing *P.O. Ventures, Inc. v. Loucks Family Irrevocable Trust,* 144 Idaho 233, 238, 159 P.3d 870, 875 (2007)).  The Idaho Supreme Court has consistently held that contracts for the sale of real property that fail to comply with the statute of frauds are unenforceable, and may not be remedied by specific performance or serve as the basis for an award of damages.  *Gugino v. Kastera, LLC (In re Ricks)*, 433 B.R. 806, 818 (Bankr. D. Idaho 2010).

Generally, a description of real property will be sufficient if it describes the property in such a way that it is possible for someone to identify "exactly" what property the seller is conveying to the buyer.  *Garner v. Bartschi,* 139 Idaho 430, 435, 80 P.3d 1031, 1036 (2003) ("A description contained in a deed will be sufficient so long as

MEMORANDUM OF DECISION − 18

quantity, identity or boundaries of property can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers.") (quoting *City of Kellogg v. Mission Mountain Interests Ltd., Co.,* 135 Idaho 239, 244, 16 P.3d 915, 920 (2000)); *Gugino v. Kastera,* 433 B.R. at 818.

While the facts of every case are unique, the case law on this issue establishes some of the parameters of what constitutes a sufficient legal description.  For example, a metes and bounds description of the property is clearly sufficient.  *P.O. Ventures, Inc.,* 144 Idaho at 238, 159 P.3d at 875.  In contrast, the inclusion of only a street address generally will not suffice.  *Ray v. Frasure*, 146 Idaho 625, 630, 200 P.3d 1174, 1179 ("The physical address gives no indication of the quantity, identity, or boundaries of the real property.").  Moreover, if extrinsic evidence is available that will precisely describe the property but the written agreement does not specifically refer to that extrinsic evidence, then the agreement will still violate the statute of frauds.  *Id.*; *Elsaesser v. Mountain West IRA (In Re Shiloh Mgmt. Servs., Inc.),* No. AP 19-06074-JMM, 2021 WL 150410, at *22 (Bankr. D. Idaho Jan. 15, 2021).

### B.  Analysis of the Perry and Leibow Claims

At the outset, the Court will make an editorial comment.  The testimony at the hearing established that the paperwork was generated by King, as the listing agent, and filled in by the seller's agent.  The documents are sloppy, with numerous errors forming a clear indication that the same forms were recycled and used for different buyers.  At the hearing, King described the documents as "a mess."  It is equally clear, however, that the

MEMORANDUM OF DECISION − 19

drafters included the best information they had with regard to the property descriptions, at least until the addenda executed after the final plat was recorded.  For example, with regard to Perry's PSA for the purchase of Lot 3, the earliest of the four transactions, the name of Best View Quads does not appear in the sale agreement or the first addendum. Rather, the subdivision is listed as "0 Not Applic.," and refers to the plat of record or an alternative legal description as "TBD."  The name "Best View Quads" does not appear on the preliminary plat.

In cases where a better description is available, reliance on the lot number, subdivision, city, county, state, and street address would ordinarily be inadequate to precisely describe the quantity, identity, or boundaries of the real property sufficient to satisfy the statute of frauds.  For example, the Idaho Supreme Court held that a land sale contract describing the property as "lots 11, 12, and 13, in block 13, Lemp's addition," but which failed to designate the subdivision, city, state, county, or civil or political district in which the land was situated, was insufficient and parol evidence could not be considered.  *Allen v. Kitchen*, 16 Idaho 133, 100 P. 1052 (1909).

Under some circumstances, however, the statute of frauds has been satisfied when the contracting parties have used the best description available to them.  In two prior cases, the Idaho bankruptcy court has faced the issue on slightly different facts.  In *Gugino v. Kastera,* the Court considered the sufficiency of a legal description of property under development. 433 B.R. at 820.  In that case, the documents contained not only the physical address of the property, but also the legal description of the entire parcel as well

MEMORANDUM OF DECISION − 20

as the number of completed lots that were to be developed.  The court concluded that

such description provided not only the general location of the subject property, but also

the precise quantity of building lots and the exact outer boundaries of the project.  *Id.*

Finding this satisfied the statute of frauds, the court stated,

> since the Spur Ranch property had not yet been finally platted, they had no
> choice but to rely upon a legal description of the whole property
> supplemented by other informal identifying information.  In the Court's
> view, under the circumstances, neither Ricks nor Kastera could have been
> more precise in describing the subject property, given the legal description
> of the property that was available to them at the time.

*Id.* at 820–21.

Similar facts were presented in *Old Cutters, Inc. v. City of Hailey (In re Old

Cutters, Inc.),* 488 B.R. 130 (Bankr. D. Idaho 2012).  In that case, the property at issue

was also being developed.  The agreement between the parties contained a metes and

bounds description of the entire parcel, as well as a map which showed the location of the

proposed lots within the property.  In concluding the legal description of the property

satisfied the statute of frauds, the court stated,

> As in [*Gugino v. Kastera*]*,* as nearly as they could do so at the time of
> executing the contract, and given the undeveloped state of the Property, the
> parties here identified the "precise quantity of building lots and the exact
> outer boundaries of the project."  On this record, the Court concludes that
> the property description in the parties' agreement is sufficient to satisfy
> Idaho's statute of frauds and the requirements of *Frasure.*

*Id.* at 142 (internal citation omitted).

In the case at bar, no legal description of the entire parcel was ever provided, nor

is there any evidence that one exists.  Rather, the PSAs included the lot numbers, the

MEMORANDUM OF DECISION − 21

name "Best View Quads," along with the city, county, and state the property is located in.

Moreover, it is undisputed there is not another "Best View" subdivision in the city of

Nampa.  King represented that the subdivision name he initially submitted for approval

was rejected because it was too similar to another plat in violation of Idaho Code § 50-

1307.[9]  As such, a reference to the lot number, subdivision, city, county, and state is

sufficiently descriptive of the identity of the property when that is the best information

available.  As better information came into existence, such as a street address, it was

noted on subsequent addenda.  Thus, it is apparently undisputed that, until execution of

the final addenda, the parties to this new construction project used the best property

description available at the time.  The Court concludes this satisfies the statute of frauds.

On September 23, 2019, however, a final plat for the Best View Quads was

recorded.  Ex. 308.  The document includes the engineer's drawing of the final plat, the

recorder's seal, and the book and page number of the book of plats in which the final plat

is contained.  *Id.*  Hence, by the time the later addenda were executed, the final plat had

been recorded for a month or two.  Debtor contends that because the addenda executed

---

[9] Idaho Code § 50-1307 provides, in relevant part,

> Plats of towns, subdivisions or additions must not bear the name of any other town or
> addition in the same county, nor can the same word or words similar or pronounced the
> same, be used in making a name for said town or addition, except the words city, place,
> court, addition or similar words, unless the same is contiguous and laid out and platted by
> the same party or parties platting the addition bearing the same name, or a party files and
> records the written consent of the party or parties who platted the addition bearing the
> same name.

MEMORANDUM OF DECISION – 22

after this final plat was recorded do not reference the volume and page of the book of plats in which Exhibit 308 is found, then the statute of frauds is not satisfied.[10]

The Court concludes that the Perry and Leibow PSAs and subsequent addenda satisfy the Idaho statute of frauds.  It is unclear when or if a metes and bounds legal description became available as to the entire parcel or the individual lots.  The Court notes that a reference to the book and page of the book of plats is found in the Claims of Lien recorded against Lots 2, 3, and 4, but those were not recorded until January 27, 2020.  Ex. 300 at Exs. D, E; Ex. 301 at Ex. C.  Prior to that date, there is no indication that Perry or Leibow knew the final plat had been recorded.

Accordingly, where the property was being newly developed and progressed from preliminary to final plat during the course of the transaction, and in the contracts the parties included the best known legal descriptions of the property, the Court concludes the statute of frauds is satisfied.

---

[10] The Court is mindful that the handwritten "X" on the respective lots to be purchased by each Creditor controls over the printed terms.  Idaho Code § 29-109 provides,

> Where a contract is partly written and partly printed, or where part of it is written or printed under the special directions of the parties, and with a special view to their intention, and the remainder is copied from a form originally prepared without special reference to the particular parties and the particular contract in question, the written parts control the printed parts, and the parts which are purely original control those which are copied from a form, and if the two are absolutely repugnant, the latter must be so far disregarded.

However, the purpose of the statute of frauds is not directed at whether the parties agreed on the specific property to be purchased, but rather whether the legal description makes it possible to identify the quantity, identity, or boundaries of the property.

MEMORANDUM OF DECISION – 23

The Court makes one additional point.  While the decisions from Idaho courts, and particularly the Idaho Supreme Court, indicate the requirements for satisfying the statute of frauds are exacting, *see Magnolia Enterprises, LLC v. Schons*, No. CV-08-376-BLW, 2009 WL 1658022, at *4 (D. Idaho June 11, 2009), there are limits upon its use.  It is undisputed that King and/or a seller's agent prepared the addenda, and, with the exception of the addition of the penalty clause in the Silva addendum, each of the addenda after the first serve to benefit Debtor by moving the construction completion and closing dates further out to accommodate delays in construction.  Although the issues before the Court are presented in the context of claims litigation in bankruptcy, nevertheless this Court cannot sanction Debtor's use of the statute of frauds as a sword to absolve itself from paying damages in a deal that soured.  Indeed, the Idaho Supreme Court has recently spoken to this issue.  In *Tricore Invs., LLC v. Est. of Warren through Warren*, 168 Idaho 596, 485 P.3d 92 (Idaho 2021), the court expressed its disfavor for the property seller's use of the statute of frauds in an attempt to avoid the consequences of reneging on a deal and selling the subject property to another buyer for more money.  The court observed that "The statute of frauds 'is to shield persons with interests in land from being deprived of those interests by perjury, not to arm contracting parties with a sword they may use to escape bargains they rue.'"  *Id.* at 108 (quoting *Flight Sys., Inc. v. Elec. Data Sys. Corp.*, 112 F.3d 124, 128 (3rd Cir. 1997); *see also Gibson v. Arnold*, 288 F.3d 1242, 1247 (10th Cir. 2002) (same)).  In *Tricore,* the Supreme Court's words were dicta, as the contracts therein clearly satisfied the requirements of the statute of frauds.  While a

MEMORANDUM OF DECISION − 24

closer case is presented here, this Court finds these statements applicable. Before this Court is a dispute between the original parties to each of the contracts, where the drafter of the documents now complains of their sufficiency not because of any perjury or fraud, and not to unwind the whole transaction, but rather in hopes of escaping a portion of the damage it inflicted on the Creditors. The Court concludes that, under these particular circumstances, Debtor's use of this sword should not stand.

In conclusion, Debtor's objection to Perry's proof of claim on the grounds of the statute of frauds is overruled. Moreover, Debtor objected to Leibow's claim on the same basis and the Court determines it too is subject to the same analysis and conclusion as that applied to Perry's claim. Accordingly, Debtor's objection to Leibow's proof of claim is overruled as to the statute of frauds.

### C. Analysis of the Silva Claim

While the same analysis generally applies to Silva's proof of claim, more explanation is required. Silva's purchase documents differ in several ways. First, there were three addenda executed after the final plat was recorded. Perhaps more importantly, Addendum # 6 contains terms that clearly benefit Silva. While it echoes the extension of the closing date agreed to in Addendum #5, it also provides for a penalty fee to be paid to Silva for each day beyond that deadline that the construction is not completed. In this way, Addendum #6, executed a little more than two months after the final plat was recorded, benefits Silva as well as Debtor. It is undisputed, however, that King and/or the Debtor's listing agent prepared the document.

MEMORANDUM OF DECISION − 25

More importantly, it is clear that by the time Addendums 5 and 6 were executed on December 2, 2019, both Silva and King were aware of the recording of the final plat. On October 16, 2019, Silva and King signed and recorded a Memorandum of Contract for Sale and Purchase of Real Property regarding Lot 6.  Ex. 219 at Bates Nos. 508–09. The relevant portions of the document read as follows:

> This is a Memorandum of that unrecorded Contract for Sale and Purchase of Real Property ("Contract"), dated October 15, 2019, by and between Best View Construction & Development, LLC (hereinafter referred to as "Seller"), and Josiah M. Silva Trust u/t/d August 23, 2018 (hereinafter referred to as "Buyer") concerning the real property ("Property") described as follows:

> Lot 6, Block 1, Best View Quads Subdivision, according to the plat thereof, filed in Book 48 of Plats at pages(s) 47, records of Canyon County, Idaho.

> For good and valuable consideration, Seller has agreed to sell and Buyer has agreed to buy the Property upon the terms and conditions set forth in the Contract, which terms and conditions are incorporated in this Memorandum by this reference.

> This Memorandum is not a complete summary of the Contract. Provisions of this Memorandum shall not be used in interpreting the Contract.  In the event of conflict between this Memorandum and the Contract, the Contract shall control.

*Id.*  It is clear this document contains a legal description that satisfies the statute of frauds, as it refers to the book and page number for the book of plats.  Unfortunately, neither the Silva PSA nor any of the subsequent addenda are dated October 15, 2019, making the reference to the relevant "Contract" unclear.  There was no testimony at the hearing concerning this document.

MEMORANDUM OF DECISION – 26

Because this memorandum was included as part of Silva's proof of claim, it refers to a contract between Silva and Debtor, it specifies Lot 6 of the Best View Quads subdivision in Nampa, Canyon County, Idaho, and because the book and page number of the book of plats referenced matches that in Exhibit 308, the Court confidently concludes that it refers to the PSA at issue here.

The memorandum serves two purposes for the issues at hand. First, it incorporates the terms and conditions of the agreement between the parties into the document, and second, it does not conflict with the PSA or its addenda. As such, it serves to supplement the provisions of the PSA and subsequent addenda, including the legal description, thus ensuring compliance with the statute of frauds.

## 4.  Unsecured Claim Calculation

Pursuant to the Code, the parties agree that Debtor's rejection of the purchase and sale contracts constitutes a breach of those contracts "immediately before the date of the filing of the petition." § 365(g)(1).  *See* Dkt. Nos. 5 (motion to reject executory contracts); 40 (order granting motion as to Perry contracts and Leibow contract); 138 (oral ruling granting motion as to Silva Trust contract).  As noted above, Debtor objects to the unsecured portion of Creditors' proofs of claim only.  Thus, the dispute lies in the damages resulting from the rejection, specifically the measure of damages and the valuation of the partially-constructed quadplexes.

In their submissions, Creditors claimed as damages the expected profit, which they calculated by taking the value of the improved lot—with the quadplex completed—and

MEMORANDUM OF DECISION − 27

subtracting the purchase price as reflected in the PSA.  In contrast, Debtor believes the

proper measure of damages is the difference between the purchase price and the fair

market value of the property at the time of the breach, in this case, July 21, 2020.

Moreover, not only do the parties dispute the method of measuring damages, but the

value of the property is also at issue.

   A.  *Measure of Damages*

   The measure of damages for breach is determined by reference to state law so long

as the result is not inconsistent with federal bankruptcy policy.  *Dunkley v. Rega Props.,*

*Ltd.* (*In re Rega Props., Ltd.*), 894 F.2d 1136, 1139 (9th Cir. 1990); *see also R & O*

*Elevator Co., Inc. v. Harmon,* 93 B.R. 667, 669 (D. Minn. 1988) (holding that damages

for breach caused by the rejection of an executory contract are determined by reference to

the law which would govern the value of the claim outside the context of bankruptcy); *In*

*re Widmier,* 03.4 I.B.C.R. 234, 236; No. 00-40244-JDP, 2003 WL 25273795, at *3

(Bankr. D. Idaho Nov. 18, 2003).  Accordingly, the Court looks to Idaho law for the

proper measure of damages in this case.  Idaho courts have generally gone in two

directions, one way cited by Debtor and the other championed by the Creditors.  This

Court will consider each.

   A long line of case law holds that, "The measure of damages for breach of an

executory contract of sale is the difference between the contract price and the market

value of the premises at the time of the breach unless by the contract the parties have

otherwise stipulated."  *State ex rel. Robins v. Clinger*, 72 Idaho 222, 230, 238 P.2d 1145,

MEMORANDUM OF DECISION − 28

1150–51 (1951); *Melton v. Amar*, 83 Idaho 99, 107, 358 P.2d 855, 859 (1961); *Anderson v. Michel*, 88 Idaho 228, 236, 398 P.2d 228, 233 (1965).  In 1993, the Idaho Supreme Court employed this rule and observed that the "usual measure of actual damages for a purchaser's breach of contract for sale of realty is the difference between the contract price and the market value of the property at time of breach, plus rental value for any period of possession by the purchaser."  *Margaret H. Wayne Tr. v. Lipsky*, 123 Idaho 253, 261, 846 P.2d 904, 912 (1993) (citing *Lawrence v. Franklin,* 113 Idaho 895, 749 P.2d 1020 (1988); *Smith v. King,* 100 Idaho 331, 597 P.2d 217 (1979)).

In this case, the purchaser is not the breaching party.  In the Court's view, this fact makes it difficult to employ the traditional measure of damages.  When it is a purchaser who breaches, the seller retains the property to market to another buyer.  As such, utilizing the difference between the contract price agreed to between the parties and the market value of the property at time of breach, makes sense.

Employing this same damage calculation when it is the seller who breaches does not provide the same understandable result.  If a buyer agrees to purchase property but the seller breaches the agreement, the market value of the property at time of breach is of little consequence, since that particular property is no longer in play, as least as regards that buyer.  Rather, the buyer must go find another property to purchase.  Here, not only is the seller the breaching party, but the building itself was only partially constructed at the time of the breach.  Under those circumstances, the market value of those partially-

MEMORANDUM OF DECISION − 29

constructed buildings is of little relevance to the Creditors here, who must begin the

process anew.

In support of its position, Debtor contends the case of *Dunkley v. Rega Props.,*

reinforces its position.  In that case, the Ninth Circuit reflected on the purpose of rejection

under § 365:

> The purpose of allowing rejection of an executory contract
> under section 365 is to make the debtor's rehabilitation more likely.  Also,
> "[r]ejection of an executory contract serves two purposes.  It relieves the
> debtor of burdensome future obligations while he is trying to recover
> financially and it constitutes a breach of a contract which permits the other
> party to file a creditor's claim."  Given this purpose, the Fourth Circuit
> recently held that specific performance was not an available relief
> under section 365 because "it would undercut the core purpose of
> rejection."
> Similarly, allowing recovery of the contract price would also
> undercut the purpose of rejection under section 365. As the district court
> pointed out in its memorandum decision, "[i]f the Court were to accept the
> argument made by the [non-breaching creditor], that is that they were
> entitled to the balance due on the contract, presumptively in cash, what
> point would there be to a rejection of an executory contract under 11 U.S.C.
> § 365?"

*Id.* at 1140–41 (citations omitted).

While this Court takes no issue with the statement regarding the purpose of

rejection of executory contracts in bankruptcy, the facts of *Rega* are sufficiently

distinguishable from those presented here to compel use of a different measure of

damages.  In *Rega,* the party from whom the debtor was purchasing real property

breached a separate contract for which the property was pledged as collateral.  The third-

party foreclosed and the subject property was lost.  When the debtor filed a bankruptcy

MEMORANDUM OF DECISION − 30

petition, it rejected the contract and therefore breached it, and the creditor who had lost the property to foreclosure filed a proof of claim and sued for damages.

Under those facts, allowing the creditor to receive the unpaid portion of the purchase price would serve no purpose. After all, the property had been foreclosed through no fault of the debtor, who could no longer gain the benefit of the contract. Relevant here, the *Rega* decision observed that the difference between the unpaid balance of the principal and the market value of the property at the time of the breach presupposes that the nonbreaching party will be able to realize the property's market value by subsequently selling the property to another purchaser. *Id.* at 1140. Such are not the facts presented here.

Instead, the Court finds the more appropriate measure of damages incurred by the purchasers, the Creditors in the case at bar, is that provided by the Restatement on Contracts. Prior to 1981, the Restatement on Contracts had a construction-specific provision, which provided the measure of damages for breach of contract in a building project, accounting for whether the project was salvageable or not. It read:

> § 346. Damages for Breach of a Construction Contract.
> (1) For a breach by one who has contracted to construct a specified product, the other party can get judgment for compensatory damages for all unavoidable harm that the builder had reason to foresee when the contract was made, less such part of the contract price as has not been paid and is not still payable, determined as follows:
>> (a) For defective or unfinished construction he can get judgement for either
>>> (i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or

MEMORANDUM OF DECISION – 31

> (ii) the difference between the value that the
> product contracted for would have had and the value of the
> performance that has been received by the [buyer], if
> construction and completion in accordance with the contract
> would involve unreasonable economic waste.

RESTATEMENT (FIRST) OF CONTRACTS § 346 (Am. L. Inst. 1932).

In 1981, the treatise was amended and the section specific to construction

contracts was omitted.  In observance of this change, however, the notes were amended

to provide, "The rules stated in former § 346, Damages for Breach of a Construction

Contract, are presented as applications of the general rules on damages, and that section

is omitted."  RESTATEMENT (SECOND) OF CONTRACTS § 347 Reporter's note (Am. L.

Inst. 1981).

> The section as amended reads as follows:

> § 347 Measure of Damages in General
> Subject to the limitations stated in §§ 350–53, the injured party has a right to
> damages based on his expectation interest as measured by
> > (a) the loss in the value to him of the other party's performance caused by its
> > failure or deficiency, plus
> > (b) any other loss, including incidental or consequential loss, caused by the
> > breach, less
> > (c) any cost or other loss that he has avoided by not having to perform.

RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981).

In applying the Restatement's measure of damages, the 1981 comments provide

helpful guidance:

> *b. Loss in value.* The first element that must be estimated in attempting to
> fix a sum that will fairly represent the expectation interest is the loss in the
> value to the injured party of the other party's performance that is caused by
> the failure of, or deficiency in, that performance.  *If no performance is*

MEMORANDUM OF DECISION − 32

> *rendered, the loss in value caused by the breach is equal to the value that*
> *the performance would have had to the injured party. If defective or partial*
> *performance is rendered, the loss in value caused by the breach is equal to*
> *the difference between the value that the performance would have had if*
> *there had been no breach and the value of such performance as was*
> *actually rendered. In principle, this requires a determination of the values*
> *of those performances to the injured party himself and not their values to*
> *some hypothetical reasonable person or on some market.*

*Id.* at cmt. b (emphasis added) (internal references omitted).

Here, Debtor's partial performance followed by rejection of the contracts result in Creditors walking away with no portion of the quadplexes they contracted for. In other words, the facts are tantamount to Debtor having rendered no performance whatsoever to the Creditors. Under the Restatement, the measure of damages in that case would be the value that the Debtor's performance would have had netted to the Creditors. Viewed another way, Debtor rendered a partial performance where the value of the performance actually received is zero, which results in the same damage calculation. Following Debtor's rejection of the contracts, Debtor retains both the lots and the partially constructed buildings, while the Creditors reap no benefit from Debtor's efforts. In this scenario, the proper measure of damages is the difference between the value of the finished quadplex contracted for, less the agreed-on purchase price, less the value of the performance that has been received by each Creditor. Because the deal is off and the Creditors will walk away with no buildings, the value of the performance received is zero. As such, the valuation at issue is not of the market value of the quadplexes in their

MEMORANDUM OF DECISION – 33

partially-constructed state, but rather the value of the buildings as if they had been completed.[11]

### B. Valuation of the Lots

This brings the Court to the question of valuation of the quadplexes had they been completed as of the date of the breach, July 21, 2020.  The Court has before it two different appraisals.  Exhibit 100 is an appraisal report from Integra Realty Resources; the appraisal was performed by Robin Brady.  He appraised all four lots together, and arrived at a reconciled value[12] as of July 22, 2020,[13] of $2,770,000.  Ex. 100 at p. 85.  That figure represents his valuation of all four quadplexes if complete on July 22, 2020.  *Id.* at p. 86.  From that figure he deducted the direct costs of finishing the quadplexes, estimated by the contractor at $715,261, as well as a 15% "entrepreneurial incentive" totaling $107,289, and arrived at a market value for the four lots of $1,947,450 which he rounded to $1,950,000.  *Id.* at p. 86.  To figure the value of the individual lots, Debtor took that number and simply divided by four, and determined that each lot has a value of $487,500.  Applying this value to the calculation using the general measure of damages favored by

---

[11] The Court is mindful that the value of the fully-constructed quadplex is not equal to the value the Creditors would have received had the deals had been fully realized and completed.  Practically speaking, each Creditor would have had quadplexes to rent in what is currently a landlord's market.

[12] The term "reconciled" means that he established three separate values using three different approaches– "cost," "sales comparison," and "income capitalization"–and then reconciled them into one figure.

[13] All parties agree that his appraisal should have been retrospective to July 21, 2020, which is the day of the breach according to § 365(g)(1).  However, there is nothing in the record suggesting that one day makes any difference to the analysis.

MEMORANDUM OF DECISION – 34

Debtor results in the Creditors having no unsecured damages.  For example, Perry's purchase price for Lot 2 was $549,900.  If the Court measures damages as the difference between the value of the lot as-is on the date of the breach and the purchase price, $487,500 – $549,900 = – $62,400, Perry would have no unsecured damages.

The second appraisal was performed by Sam Langston.  Ex. 302.  He likewise performed a retrospective analysis to July 21, 2020, and determined three separate values for each quadplex: a "Fee Simple Estate as of July 21, 2020 'At Stabilized'[14] Occupancy" value, an "'As Is' Assuming 90% Completion" value, and a "Fee Simple Estate 'At Stabilized' Occupancy as of November 8, 2020" value.  *Id.* at p. 15.  Similar to Mr. Brady's analysis, Mr. Langston looked at the cost, sales comparison, and income approaches, but excluded the cost approach, finding it unreliable in this instance, where the buyer is likely an investor.  *Id.* at p. 85.  He reconciled the values and opined that the "Fee Simple Estate as of July 21, 2020 'At Stabilized' Occupancy" retrospective market value of each unit as of July 21, 2020 was $750,000.  *Id.* at pp. 85–86.  On the other hand, the "As Is" Assuming 90% Completion value of each lot is $557,000.[15]  *Id.* at pp.

---

[14] The Court could not locate a definition of "at stabilized" occupancy within Mr. Langston's report. However, the Court assumes the term refers to long-term, and hence more stable, occupancy rates, as opposed to those for a new rental unit.

[15] Langston began with the full value of the finished quadplexes—$750,000—and calculated 90% of that figure—$675,000.  He then deducted an "entrepreneurial incentive" of 15%—totaling $112,500—and further deducted estimated rent losses to allow for the leasing of the vacant units to reach stabilized occupancy —totaling $5,300—to arrive at the $557,000 figure.  *Id.* at p. 87.  It does not appear that he deducted the costs necessary to finish the quadplexes.

MEMORANDUM OF DECISION − 35

87–88.  Finally, Mr. Langston determined the "Fee Simple Estate 'At Stabilized' Occupancy as of November 8, 2020" value was $750,000, after finding there was no "market measurable change in value" in the intervening months.  *Id.* at pp. 89–90.

As discussed above, the Court believes the Restatement's approach to damage calculation is the best fit under these circumstances.  As such, the "as is" value on the date of breach is of little use here.[16]  Because Mr. Langston's appraisal focused on the value of each individual quadplex if it were complete on July 21, 2020, the Court concludes his approach is more reliable.  However, it is noteworthy that Mr. Brady's appraisal report also reaches a figure for the value of all four quadplexes if complete, and the difference between his figure and that opined by Mr. Langston is only $230,000, which works out to $57,500 per lot.  Nevertheless, the Court concludes that the value of each quadplex, if complete on July 21, 2020, is $750,000.

*C. Interest*

It is undisputed by the parties that, pursuant to Idaho Code § 28-22-104, the Creditors are entitled to interest on their secured claims.  While the statutory interest rate is 12%, and the PSAs and proofs of claim all include a 12% interest rate, the confirmed plan provides, for each of the Creditor's claims,

---

[16] Even if the Court were to use the value of the lots at the time of the rejection, Mr. Brady's analysis is not reliable principally because he valued all of the units together and Debtor simply divided by four to reach the value of each independent lot.  However, the testimony is undisputed that the buildings were at different stages of completion at the time of the breach, spanning between 50–70% complete.  Accordingly, the methodology by which Debtor arrived at the per-lot value is flawed.

MEMORANDUM OF DECISION − 36

> Interest shall accrue on this secured claim at the rate of six percent (6%) from the date the funds were paid by [Creditor] until the date the secured amount [] is paid.  The accrued interest shall be added to the allowed unsecured claim held by [Creditor] and paid as part of Class 11.

Ex. 101 at ¶ 4.1; Dkt. No. 259.  After none of the Creditors objected to the plan, it was confirmed and now binds the parties.  *In re Lovey,* 599 B.R. 97, 104 (Bankr. D. Idaho 2019); § 1141(a).  As such, the Court presumes the six percent interest rate therein will take precedence over any interest rate specified in the PSAs, Idaho statute, or the proofs of claim.  If any party disputes that rate of interest, he or she may so indicate and set the matter for hearing.

Moreover, at the close of the hearing on Debtor's objections to Creditor's proofs of claim, the Court requested that the parties file a stipulation regarding the amount of interest and attorneys' fees allowed, but the parties did not comply.  While the amount of the attorneys' fees incurred do not appear to be in dispute, discussed below, the Court cannot calculate the interest at this time.  First, pursuant to the confirmed plan, the interest began to accrue "from the date the funds were paid by [Creditor]."  The Court cannot be sure if the funds were paid as of the contract date or later.  In at least two of the sales, the amount of earnest money was increased in an addendum.  Second, the accrual of interest ends when the secured amounts are paid.  The record before the Court indicates that the lots have been sold post-petition to a different buyer, Exs. 102–107, but there is no evidence whether those sales have closed and whether the Creditors' secured claims have been paid from the proceeds, as contemplated in the plan.  Ex. 101 at ¶ 4.1.

MEMORANDUM OF DECISION – 37

Accordingly, unless the parties stipulate to something different or the Court subsequently decides otherwise following an objection by a party in interest, the Court will allow interest at the rate of six percent on each of the Creditors' secured claims, calculated from the date the funds were paid to Debtor until the date the Creditor's secured claim is paid. Before the Court can enter a final tally of the allowed unsecured claims for each Creditor, the parties must file a stipulation in which those interest amounts are calculated.

### D.  Attorneys' Fees

Each of the Creditors sought attorneys' fees in their respective proofs of claim. Debtor does not dispute their right to such fees as long as they were incurred pre-petition. The proofs of claim submitted by Perry and Leibow include a sum for attorneys' fees as of July 22, 2020, the petition date. Silva's proof of claim does not specify the dates the fees were incurred, but during the hearing, Silva's counsel indicated that the fees sought were for pre-petition services only. Accordingly, the fees included in the proofs of claim at issue will be allowed and included in the unsecured portion of each claim.

### E.  Penalty Fee in Silva Contract

As briefly discussed above, Addendum #6 to the Silva PSA includes a penalty fee assessed in favor of Silva, as follows: "$100 per day for each day past April 30, 2020 that construction is not complete. Penalty fee will be assessed each day until all units have

MEMORANDUM OF DECISION − 38

received a certificate of occupancy." Ex. 219 at Bates No. 499. It was signed by Silva on December 2, 2019 at 7:41 pm and by King on that same date at 8:02 pm.[17] *Id.*

The previous addendum, Addendum #5, was signed by King on November 23, 2019 and by Silva on December 2, 2019 at 5:52 pm. *Id.* at Bates No. 497. It mirrors the final addenda attached to the other PSAs—it extends the closing date to April 30, 2020, and provides the street address for the particular lot. *Id.* Addendum #6 contains the same text as Addendum #5, but goes a step further and adds the penalty clause.

Debtor argues that because the closing date was extended in Addendum #5, it received nothing in return for the penalty clause, rendering it unenforceable for lack of consideration. It is hornbook contract law that in order for a contact provision to be enforceable, there must be consideration. *Weisel v. Beaver Springs Owners Ass'n, Inc.,* 152 Idaho 519, 527, 272 P.3d 491, 498 (2012) (citing *Great Plains Equip., Inc. v. N.W. Pipeline Corp.,* 132 Idaho 754, 769, 979 P.2d 627, 642 (1999)). While courts generally will not assess the sufficiency of consideration, it "must have some value in the eyes of the law." *Id.* Nevertheless, "[w]here an agreement is captured within a written instrument, a presumption arises that it is supported by consideration. *Id.* (quoting *W.L. Scott, Inc. v. Madras Aerotech, Inc.,* 103 Idaho 736, 741, 653 P.2d 791, 796 (1982)); *see also* Idaho Code § 29-103 ("A written instrument is presumptive evidence of a consideration."). Once this presumption arises, the party seeking to assert the affirmative

---

[17] The addenda were signed electronically by Silva, and thus include a date and time stamp.

defense of lack of consideration must establish that defense by a preponderance of the evidence. *W.L. Scott, Inc.*, 103 Idaho at 741, 653 P.2d at 796 (citing *Lewis v. Fletcher,* 101 Idaho 530, 617 P.2d 834 (1980); *Rosenberry v. Clark,* 85 Idaho 317, 379 P.2d 638 (1963)); Idaho Code § 29–104 ("The burden of showing a want of consideration sufficient to support an instrument lies with the party seeking to invalidate or avoid it.").

At the hearing in the case before this Court, Silva was asked directly whether Addendum #5 was transmitted to King, and he testified that he "absolutely" knew that his agent did not send that document to King. On the other hand, King testified that he "received" a copy of Addendum #5 from either Silva or his agent, although he was not specific about whether he received it on December 2, 2019, after Silva signed it, or in the course of this claims litigation after the bankruptcy case was filed. While not evidence, Silva's counsel admitted in the hearing that she may have inadvertently included Addendum #5 in the documents supporting the proof of claim. Moreover, the timing of Silva's execution of the two addenda is important. While King signed Addendum #5 on November 23, 2019, Silva did not sign that document until December 2, 2019. Less than two hours later, Silva signed Addendum #6. As discussed above, while Silva has the ultimate burden of proof on the merits of the proof of claim, including the inclusion of the penalty clause, Idaho Code and case law presume there is consideration to support that clause. Debtor bears the burden of proof to refute that presumption and must prove

MEMORANDUM OF DECISION – 40

by a preponderance of the evidence that Addendum #5 was not sent. The Court finds that Debtor has not met that burden.[18]

Because the Court concludes the penalty clause is enforceable, a penalty amount will be included as part of Silva's allowed unsecured claim. Silva's last amended proof of claim, dated November 19, 2020, includes an ongoing penalty amount beginning on May 1, 2020. However, because Debtor rejected the contract, constituting a breach as of July 21, 2020, the Court will assess the penalty fee only for the days between May 1, 2020 and July 21, 2020. For those 81 days, the penalty amount would be $8,100. That amount will be added to Silva's unsecured claim.

### F. Calculations

#### (i) Lot 2, Susan Perry

The Court calculates the unsecured portion of Perry's claim on Lot 2 as follows, exclusive of interest:

| | |
|---|---|
| Value of Lot 2 if completed on July 21, 2020: | $750,000 |
| Secured claim (down payment): | − $125,000 |
| Remaining purchase price not paid: | − $424,900 |
| Attorney's Fees: | + $   5,650.72 (Lots 2 and 3) |
| Interest: | + $  TBD |

Total unsecured claim on Lot 2, exclusive of interest:  $205,750.72

---

[18] The Court finds it interesting that Debtor raises the issue of consideration. After all, what consideration is there for Creditors to have executed *any* of the addenda, save for the Addendum #6 to the Silva PSA? When Creditors agreed to repeatedly extend the closing date, there is no evidence they received any consideration for doing so. The Court views Debtor's argument as rather disingenuous.

MEMORANDUM OF DECISION − 41

(ii)  Lot 3, Susan Perry

The Court calculates the unsecured portion of Perry's claim on Lot 3 as follows,

exclusive of interest:

| | |
|---|---|
| Value of Lot 3 if completed on July 21, 2020: | $750,000 |
| Secured claim (down payment): | – $ 25,000 |
| Remaining purchase price not paid: | – $444,000 |
| Attorney's Fees: | + $  0  (included above) |
| Interest: | + $ TBD |

Total unsecured claim on Lot 3, exclusive of interest:  $305,975

(iii)  Lot 4, Sherman Leibow

| | |
|---|---|
| Value of Lot 4 if completed on July 21, 2020: | $750,000 |
| Secured claim (down payment): | – $125,000 |
| Remaining purchase price not paid: | – $424,900 |
| Attorney's Fees: | + $   3,767.14 |
| Interest: | + $ TBD |

Total unsecured claim on Lot 4, exclusive of interest:  $203,867.14

(iv)  Lot 6, Josiah M. Silva Trust

| | |
|---|---|
| Value of Lot 6 if completed on July 21, 2020: | $750,000 |
| Secured claim (down payment): | – $125,000 |
| Secured claim (construction deposit) | – $250,000 |
| Funds on deposit at title co. (not included in claim) | – $ 25,000* |
| Remaining purchase price not paid: | – $150,000 |
| Attorney's Fees: | + $   4,000 |
| Penalty: | + $   8,100 |
| Interest: | + $ TBD |

Total unsecured claim on Lot 6, exclusive of interest:  $212,100

*Silva paid $275,000 to Pioneer Title as a construction deposit, but King testified that approximately $25,000 of those funds remain with the title company and are available to Silva.  Accordingly, those funds are not part of Silva's claim.

MEMORANDUM OF DECISION – 42

### *Conclusion*

Based upon the foregoing, the Court overrules Debtor's objections to the unsecured portions of Creditors' proofs of claim with the exception of the penalty fee in Silva's claim, which shall be $8,100, and the approximately $25,000 balance remaining on deposit at Pioneer Title, which is available to Silva and therefore not included.  The Court will allow those claims as described above.

Debtor and Creditors shall submit a stipulated agreement regarding the interest calculations and rate, as directed above, along with a proposed order for the Court's signature that includes the final amount of the allowed claims, including interest.

DATED:  August 24, 2021

_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION – 43